UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

XAVIER CHANCE,

                              Plaintiff,            Case # 18-CV-6043-FPG

v.                                                         DECISION AND ORDER

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

## INTRODUCTION

Plaintiff Xavier Chance brings this action pursuant to the Social Security Act seeking review of the final decision of the Commissioner of Social Security that denied his application for Supplemental Security Income ("SSI") under Title XVI of the Act. ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c)(3).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). ECF Nos. 11, 15. For the reasons that follow, the Commissioner's motion is GRANTED, Chance's motion is DENIED, and the complaint is DISMISSED WITH PREJUDICE.

## BACKGROUND

In February 2014, Chance protectively applied for SSI with the Social Security Administration ("the SSA"). Tr.[1] 76. He alleged disability since March 27, 2013 due to bipolar disorder, learning disabilities, and a heart condition. Tr. 64-65, 176. On August 3, 2016, Chance testified at a hearing before Administrative Law Judge Elizabeth W. Koennecke ("the ALJ"). Tr. 42. On September 21, 2016, a second hearing was held, at which a vocational expert ("VE")

---

[1] "Tr." refers to the administrative record in this matter. ECF No. 8.

1

testified. Tr. 31. On September 29, 2016, the ALJ issued a decision finding that Chance was not disabled. Tr. 10-19. On November 14, 2017, the Appeals Council denied Chance's request for review. Tr. 1-4. This action seeks review of the Commissioner's final decision. ECF No. 1.

## LEGAL STANDARD

### I. District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quotation marks omitted); *see also* 42 U.S.C. § 405(g). The Act holds that a decision by the Commissioner is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quotation marks omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quotation marks omitted); *see also Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990) (holding that review of the Secretary's decision is not *de novo* and that the Secretary's findings are conclusive if supported by substantial evidence).

### II. Disability Determination

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 416.920(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of

2

impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id.* § 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id.* § 416.920(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. If not, the ALJ determines the claimant's residual functional capacity ("RFC"), which is the ability to perform physical or mental work activities on a sustained basis, notwithstanding limitations for the collective impairments. *See id.* § 416.920(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 416.920(f). If the claimant can perform such requirements, then he or she is not disabled. *Id.* If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id.* § 416.920(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 416.960(c).

# DISCUSSION

## I. The ALJ's Decision

The ALJ analyzed Chance's claim for benefits under the process described above. At step one, the ALJ found that Chance had not engaged in substantial gainful activity since the application date. Tr. 12. At step two, the ALJ found that Chance has one severe impairment: "a mental impairment." Tr. 12. At step three, the ALJ found that his impairment did not meet or medically equal any Listings impairment. Tr. 13-15.

Next, the ALJ determined that Chance retains the RFC to perform "a full range of work at all exertional levels." Tr. 15. The ALJ also found that Chance can understand and follow simple instructions and directions; perform simple tasks independently; maintain attention and concentration for simple tasks; regularly attend to a routine and maintain a schedule; and handle simple, repetitive work-related stress in that he can make occasional decisions directly related to performing simple tasks in a position with consistent job duties that does not require him to supervise or manage the work of others. Tr. 15. Furthermore, Chance should avoid work requiring more complex interaction or joint effort to achieve work goals; can tolerate superficial contact with the public; and can make simple notations and read simple phrases but cannot perform a job requiring significant reading or note taking. Tr. 15.

At step four, the ALJ found that Chance has no past relevant work. Tr. 18. At step five, the ALJ relied on the VE's testimony and found that Chance can adjust to other work that exists in significant numbers in the national economy given his RFC, age, education, and work experience. Tr. 18-19. Specifically, the VE testified that Chance can work as a hand packager, material handler, and equipment cleaner. Tr. 18. Accordingly, the ALJ concluded that Chance is not disabled. Tr. 19.

## II. Analysis

Chance challenges the ALJ's decision on two grounds. First, he argues that the ALJ did not properly evaluate Listing 12.05 at step three. Second, he contends that the ALJ improperly assessed the opinion of consultative examiner Adam Brownfield, Ph. D. The Court discusses each argument in turn.

### a. Listing 12.05

Chance asserts that the ALJ did not properly evaluate Listing 12.05 at step three because she (1) determined that Chance was not deficient in his adaptive functioning and (2) did not order an IQ test. ECF No. 11-1 at 10-15.

#### i. Facts

The record shows that Chance has long dealt with cognitive and intellectual limitations, but the issue in this case is whether and to what extent those limitations translate into deficits in his adaptive functioning.

By way of background, Chance was born in April 1989. Tr. 45. He completed ninth grade and did not obtain a GED. Tr. 45. While in school, he was enrolled in special education and was diagnosed with learning disabilities. Tr. 46. When he was thirteen, Chance received testing for his intellectual abilities. The tester, a school psychologist, determined that Chance had a "Full Scale IQ of 55," which fell "within the Mentally Deficient range of functioning." Tr. 211. In addition, "[b]oth his Verbal and Performance Abilities . . . fell within the Mentally Deficient range." Tr. 211. The school psychologist noted that the results "should be interpreted with caution, however," because Chance was "extremely resistant to completing the activities," "often became angry and frustrated," and "became increasingly defiant and expressed oppositional tendencies, which significantly interfered with his overall performance on the various tasks that he

5

completed." Tr. 210-11. Since childhood, providers have diagnosed Chance with schizophrenia, bipolar disorder, factitious disorder, depression, anxiety, attention-deficit/hyperactivity disorder, antisocial personality disorder, learning disorder, oppositional defiant disorder, and alcohol dependence. Tr. 325, 341, 345, 424, 479.

In terms of adaptive functioning, the evidence is mixed. As the ALJ noted in her decision, at the hearing Chance "testified to an ability to do basically nothing for himself, [requiring] substantial reliance on his grandmother." Tr. 14. For example, Chance testified that he got lost using the bus because he could not read the signage indicating that he needed to switch buses; he often struggled finding the "right words" to express himself; he could not perform simple calculations for transactions; he could not cook for himself; he could not read or fill out forms; he is uncomfortable around people; and he cannot adequately wash dishes. Tr. 51, 52, 55, 57, 58, 59, 60. At the consultative examination, Chance reported that his mother does the laundry, shopping, and money management because, due to his intellectual limitations, he cannot perform those tasks himself. Tr. 320.

But there is also evidence that Chance's functioning is not so limited. At the consultative examination, Chance also stated that he could "dress, bathe, and groom himself," that he could "cook simple food, clean, and take public transportation," and that he has a good relationship with his family. Tr. 320. While incarcerated, Chance was able to fill out forms for his mental health requests, *see, e.g.*, Tr. 393-96, and could exercise and engage in recreational activities. Tr. 439. Chance has reported that medication helps alleviate the symptoms of his mental condition, but he inconsistently obtains treatment and maintains his prescriptions. Tr. 17, 380-81. There is also evidence suggesting that Chance has issues with alcohol dependence, but Chance downplayed his

6

alcohol use at the hearing and has historically provided inconsistent information regarding his use. *See, e.g.*, Tr. 61-62, 319, 323, 333, 341, 374, 442, 467, 493.

The ALJ concluded that Chance could "satisfactorily navigate activities of daily life," such that "he does not suffer from deficits in adaptive functioning." Tr. 13. The ALJ recognized the conflicting evidence on this issue. Tr. 14, 16. Resolving this conflict, the ALJ found "no basis" to rely on Chance's testimony to the effect that he could do "basically nothing for himself." Tr. 14. She noted that Chance had elsewhere reported that he could navigate the daily activities of life, including dressing, bathing, grooming, cooking simple food, cleaning, and taking public transportation. Tr. 14.

The ALJ also found that some of Chance's assertions were inconsistent with evidence in the record: Chance testified that he could not fill out forms or read, but there is evidence that he could adequately complete request forms while incarcerated. Tr. 17, 51, 59, 394. Chance downplayed his alcohol use and dependence, but the record shows otherwise. Tr. 17, 62, 319, 323, 333, 341, 374, 442, 467, 493. The ALJ also noted that the record included "statements by doctors suggesting [Chance] was engaging in possible malingering or misrepresentation." Tr. 17. In short, the ALJ did not find Chance's testimony credible. Tr. 14, 17. The ALJ determined that Chance had mild restrictions in his daily activities and moderate restrictions in social functioning and concentration, persistence, or pace. Tr. 14. Given the lack of deficits in adaptive functioning, the ALJ declined to order further IQ testing. Tr. 14.

### ii. Discussion

"Listing 12.05 relates to intellectual disability," which is defined as "significantly sub-average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, *i.e.*, the . . . onset of the impairment before age 22." *Williams v.*

7

*Berryhill*, No. 17-CV-6205, 2018 WL 1663260, at *3 (W.D.N.Y. Apr. 6, 2018). "If the claimant's impairment satisfies this diagnostic description and one of four sets of [other] criteria . . . the ALJ will find that his impairment meets the Listing." *Id.* Thus, to be found disabled under Listing 12.05, a claimant must show, *inter alia*, "significantly subaverage general intellectual functioning *with deficits in adaptive functioning* initially manifested before age 22." *Griffin v. Comm'r of Social Sec.*, No. 17-CV-426, 2019 WL 486089, at *2 (W.D.N.Y. Feb. 7, 2019) (emphasis added).

"Adaptive functioning refers to an individual's ability to cope with the challenges of ordinary everyday life." *Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012) (internal quotation marks and brackets omitted). Courts in this Circuit have held that "deficits in only two of the following adaptive functioning skills areas are required: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Griffin*, 2019 WL 486089, at *4.

In this case, Chance cites a variety of evidence to show that he "demonstrated multiple problems with adaptive function," and he argues that the ALJ "ignored all of them in her decision." ECF No. 11-1 at 13. The Court disagrees. There was conflicting evidence in the record. Some evidence—chiefly Chance's hearing testimony—suggested that he had significant difficulties managing his daily activities, while other evidence indicated that he had more moderate difficulties that were either exacerbated by his alcohol dependence or otherwise exaggerated. It was the ALJ's function to resolve the conflict, and this Court must defer to the ALJ's resolution if it is "based on application of the proper legal standards and is supported by substantial evidence." *Brown v. Colvin*, No. 15-CV-269, 2016 WL 5402695, at *3 (W.D.N.Y. Sept. 28, 2016); *see also Cage v. Comm'r of Social Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (stating that a court must "defer to the Commissioner's resolution of conflicting evidence").

8

The ALJ articulated a reasonable rationale for resolving the conflict against Chance. The ALJ noted that, contrary to his testimony, Chance could fill out forms, tolerated social contact, and engaged in recreational activities while incarcerated. Tr. 17. The ALJ pointed out that Chance provided "inconsistent information about his substance abuse," and she reasoned that "[t]he fact that [Chance] provided inaccurate information on a matter so integral to determining disability suggests that much of what [he] has alleged may be similarly unreliable." Tr. 17. The ALJ also noted that providers have questioned whether Chance was "engaging in possible malingering or misrepresentation." Tr. 17. These reasons provide sufficient grounds for the ALJ to discount the severe limitations that Chance described at the hearing. Although Chance contends that some of the evidence supports his position, he does not argue that the ALJ's reasons for questioning his veracity were unreasonable. *See Gonzalez-Cruz v. Comm'r of Social Sec.*, 294 F. Supp. 3d 164, 187 (W.D.N.Y. 2018) ("[U]nder the substantial evidence standard of review, it is not enough for [p]laintiff to merely disagree with the ALJ's weighing of the evidence or to argue that evidence in the record could support [his] position.").

Having discounted Chance's testimony and resolved that conflict, the ALJ could reasonably conclude that Chance did not have sufficient deficits in adaptive functioning: while Chance historically displayed deficits in academic skills, he could fill out forms, dress, bathe, and groom himself, cook simple food, clean, take public transportation, tolerate social contact with his family and others, and manage his medical and mental health needs. Tr. 14, 17; *see Talavera*, 697 F.3d at 154 (characteristics consistent with adequate adaptive functioning include "the ability to navigate public transportation without assistance, engage in productive social relationships, and manage [one's] own personal finances"). Furthermore, the ALJ noted that at his consultative examination, Chance was well-groomed, cooperative, and dressed appropriately, and his

9

expressive and receptive language were adequate, with coherent and goal-directed thought processes. Tr. 16, 319; *see Talavera*, 697 F.3d at 154 (stating that "display of 'fluent' speech, 'coherent and goal-directed' thought processes, and 'appropriate' affect" supported finding that claimant did not suffer from deficits in adaptive functioning). In light of this evidence, Chance's educational record alone did not necessarily establish deficits in adaptive functioning. *See, e.g.*, *Peterson v. Berryhill*, No. 17-CV-6397, 2018 WL 4232896, at *3 (W.D.N.Y. Sept. 5, 2018).

Accordingly, the ALJ reasonably concluded that Chance did not have sufficient deficits in adaptive functioning. As a result, the ALJ did not err when she declined to order IQ testing. *See Wells v. Colvin*, No. 13-CV-130, 2014 WL 3866029, at *4 (E.D. Ky. Aug. 6, 2014) (ALJ did not err when he declined to order IQ testing because claimant did not demonstrate necessary deficits in adaptive functioning); *Turner v. Colvin*, No. 12-CV-1275, 2013 WL 3791492, at *6 (S.D. Ill. July 19, 2013) (same).

### b. Dr. Brownfield's Opinion

Chance asserts that the ALJ erred because she did not incorporate one of the limitations Dr. Brownfield identified—specifically, Chance's need for supervision—into the RFC determination.

#### i. Facts

On May 5, 2014, Chance met with Dr. Brownfield for a consultative psychiatric examination. Tr. 318-321. After conducting the examination, Dr. Brownfield diagnosed Chance with schizophrenia, a learning disorder in reading, "[r]ule out" intellectual disability, and alcohol abuse. Tr. 321. As is relevant here, Dr. Brownfield opined that Chance is "mildly limited in following and understanding simple directions and instructions and performing simple tasks independently," and is "markedly limited in making appropriate decisions, relating adequately

with others, appropriately dealing with stress, and performing complex tasks independently, *and requires supervision*." Tr. 320 (emphasis added).

In her decision, the ALJ gave considerable weight to Dr. Brownfield's opinion, "as it was rendered after a thorough examination of [Chance] by a physician with extensive program and professional expertise." Tr. 17. The ALJ declined to afford the opinion greater weight, however, because Chance's "high level of daily activity . . . demonstrates that he has some greater abilities than those that were opined." Tr. 17. The ALJ stated that the RFC "limits [Chance] to simple tasks to address any intellectual or concentration deficits, limits social interaction and addresses the supported level of 'illiteracy.' Further limits are not supported." Tr. 17. The ALJ noted Dr. Brownfield's opinion that Chance required supervision but not did specifically explain why she did not adopt that limitation. *See* Tr. 17.

**ii. Discussion**

In general, an ALJ is not required to "reconcile explicitly every conflicting shred of medical testimony," *Dioguardi v. Comm'r of Social Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006) (citation omitted), and "[t]here is no absolute bar to crediting only portions of medical source opinions." *Younes v. Colvin*, No. 1:14-CV-170 (DNH/ESH), 2015 WL 1524417, at *8 (N.D.N.Y. Apr. 2, 2015). However, where the ALJ's "RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Dioguardi*, 445 F. Supp. 2d at 297 (quoting S.S.R. 96-8p, 1996 WL 374184, at *7 (S.S.A. July 2, 1996)). Accordingly, when an ALJ adopts only portions of a medical opinion, she must explain why the remaining portions were rejected. *Raymer v. Colvin*, No. 14-CV-6009P, 2015 WL 5032669, at *5 (W.D.N.Y. Aug. 25, 2015). This explanation need not be exhaustive: it is enough if the Court can "glean the rationale of an ALJ's decision." *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir.

1983) (stating that courts "do not require that [the ALJ] have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability").

Contrary to Chance's argument, the ALJ adequately explained her rationale. In the first place, it is not clear to the Court that the RFC is inconsistent with Dr. Brownfield's opinion that Chance "requires supervision." Tr. 320. Dr. Brownfield opined that Chance could follow simple directions and perform simple tasks independently. Tr. 320. The ALJ adopted this limitation. Tr. 15. Dr. Brownfield then opined that Chance "requires supervision," but he did so in the context of stating that Chance is markedly limited in his ability to perform complex tasks. Tr. 320. Thus, Dr. Brownfield's opinion could be understood to mean that Chance would need supervision for complex tasks. Because the ALJ limited Chance to simple tasks, a restriction pertaining to complex tasks would be irrelevant.

Regardless, even if the supervision limitation could be understood to be more restrictive than the ALJ's RFC, the Court can adequately glean the ALJ's rationale. The ALJ reasoned that the greater restrictions Dr. Brownfield identified were inconsistent with the evidence showing Chance's independent daily activities. *See* Tr. 17. This is a permissible factor. *See Cobb v. Comm'r of Social Sec.*, No. 16-CV-6265, 2017 WL 1832070, at *5 (W.D.N.Y. May 8, 2017) ("[A]n ALJ generally will give more weight to a medical opinion that is consistent with the record as a whole."); 20 C.F.R. § 416.927(c)(4).

Chance challenges the ALJ's reasoning in this regard, asserting that Chance actually received "direct supervision" in the activities that the ALJ identified to show that he could perform simple tasks without supervision. ECF No. 11-1 at 17. Chance argues that the activities in which he engaged in prison were "obviously highly structured and supervised," and he notes that there is

evidence that his family assisted him in many daily activities. ECF No. 11-1 at 17. The Court is not persuaded. Chance cites no record evidence to establish that his prison activities were structured or supervised, and, as discussed above, the ALJ could reasonably reject Chance's claim that he could "do basically nothing for himself." Tr. 14.

Because the Court can glean the ALJ's rationale, and such rationale is supported by substantial evidence, Chance's argument with respect to Dr. Brownfield's opinion does not justify remand.

## CONCLUSION

For all of the reasons stated, the Commissioner's Motion for Judgment on the Pleadings (ECF No. 15) is GRANTED and Plaintiff's Motion for Judgment on the Pleadings (ECF No. 11) is DENIED. The complaint is DISMISSED WITH PREJUDICE, and the Clerk of Court is directed to enter judgment and close this case.

IT IS SO ORDERED.

Dated: May 14, 2019
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court